UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

EAZS HARPER,                          :
          Plaintiff          :          CIVIL ACTION NO. 3:12-CV-1292
                                     :          (Judge Nealon)
       v.                    :          (Magistrate Judge Mehalchick)
                                     :
UNITED STATES OF AMERICA,   :
ET AL.,                               :
          Defendants        :

## MEMORANDUM

## I.   BACKGROUND

On June 5, 2012, Plaintiff, Eazs Harper, an inmate currently confined at the

United States Penitentiary in Florence, Colorado, filed the instant action, pro se,

pursuant to 28 U.S.C. § 1331 (Bivens v. Six Unknown Named Agents of Federal

Bureau of Narcotics, 403 U.S. 388 (1971)), and the Federal Tort Claims Act, 28

U.S.C. § 2671, et seq. ("FTCA").  He complains of events that occurred while he

was confined at the United States Penitentiary in Lewisburg, Pennsylvania ("USP-

Lewisburg").  (Doc. 1).  Plaintiff alleges that, despite reminding Defendants of his

need to be separated from all persons who were in gangs or associated with gangs,

due to his cooperation with the government, Defendants failed to protect him

when they placed him in restraints and into a cell with a known gang member, and

then failed to intervene when this cellmate assaulted him.  (Id.).

On January 22, 2013, the case was verbally reassigned to Magistrate Judge

Martin C. Carlson. On July 2, 2013, Defendants filed a motion to dismiss, or in the alternative, a motion for summary judgment, a brief in support, and a statement of facts. (Docs. 21, 23, 24). On July 17, 2013, the case was verbally reassigned to Magistrate Judge Karoline Mehalchick. On February 20, 2014, Magistrate Judge Mehalchick issued the first Report and Recommendation in this matter, recommending that Defendants' motion for summary judgment on Plaintiff's failure to protect and intervene claims and Defendants' motion to dismiss Plaintiff's FTCA claim be granted, Plaintiff's request for an injunction be dismissed. (Doc. 43). On March 12, 2014, Plaintiff filed objections to the first Report and Recommendation. (Doc. 45).

On May 1, 2014, this Court issued a Memorandum and Order ("M&O") adopting, in part, the first Report and Recommendation by: (1) denying Defendants' motion for summary judgment on the Eighth Amendment and FTCA claims; (2) granting Defendants' motion for summary judgment on the injunctive relief claim; (3) dismissing and terminating Defendants Samuels, Thomas, Bledsoe, and Young from the action; (4) dismissing the official capacity claims against Hudson; (5) denying Defendants' motion for summary judgment based on lack of personal involvement of Defendants Hudson, Snider, Gemberling, and Contri; (6) denying Defendants' motion for summary judgment based on qualified

immunity as premature; and (7) directing Plaintiff to file an amended complaint. (Docs. 52, 53).

On May 28, 2014, Plaintiff filed an amended complaint against Defendants Carrasquilla, Contri, Edinger, Eger, Gemberling, Hudson, Poeth, Sampson, Snider, Webb, other unknown actors on the behalf of USP-Lewisburg, and the United States of America. (Doc. 55). In his amended complaint, Plaintiff seeks compensatory and punitive damages against these Defendants for, inter alia, failing to protect him from the assault of a new cellmate introduced to his cell on October 5, 2010, and for failing to intervene in the assault. (Id. at pp. 19-23).

On August 12, 2014, Defendants filed a motion for partial summary judgment. (Doc. 61). Defendants filed a brief in support and statement of facts on September 9, 2014. (Docs. 64, 65). This motion seeks summary judgment on the behalf of Defendants Hudson, Snider, Contri, Gemberling, Sampson, and Webb on the ground that they lacked personal involvement in the alleged constitutional violations. (Doc. 61); (Doc. 65, pp. 1, 6-13). Defendants also ask that the amount of compensatory damages be limited to ten thousand dollars ($10,000.00), and the punitive damages claim under the FTCA against the United States of America be dismissed. (Doc. 65, pp. 14-15). On December 15, 2014, Plaintiff filed a brief in opposition. (Doc. 69). On December 29, 2014, Defendants filed a reply brief.

3

(Doc. 70).

On January 7, 2015, Magistrate Judge Mehalchick issued a Report and Recommendation ("R&R") addressing Defendants' motion for partial summary judgment, which recommends that: (1) Defendants' motion for summary judgment be granted; (2) Plaintiff's Eighth Amendment claim against Defendants Hudson, Snider, Contri, Gemberling, Sampson, and Webb be dismissed with prejudice; (3) Plaintiff's compensatory damages against the United States be limited to ten thousand dollars ($10,000.00); (4) Plaintiff's FTCA claim for punitive damages against the United States of America be dismissed with prejudice; and (5) this matter be remanded to Magistrate Judge Mehalchick for any further proceedings. (Doc. 71).

On January 27, 2015, Plaintiff filed a motion requesting an extension of time to file objections to the R&R. (Doc. 72). On that same day, Plaintiff's motion was granted and he was allowed to file objections to the R&R on or before February 27, 2015. (Doc. 73). On February 5, 2015, Plaintiff filed a second motion for extension of time to file objections to the R&R. (Doc. 74). On February 10, 2015, Plaintiff's motion was granted and March 30, 2015, was set as Plaintiff's deadline to file objections to the R&R. (Doc. 75). On March 31, 2015, this Court, having not received Plaintiff's objections by the March 30, 2015,

4

deadline, issued an Order and Memorandum adopting the R&R. (Docs. 76, 77).

On April 6, 2015, Plaintiff filed objections to the R&R. (Doc. 79). Plaintiff certified that he mailed "a true and correct copy of the foregoing Plaintiff's Rejection to Magistrate Judgement" to the "Defendant Assistant U.S. Attorney Office" on March 28, 2015. (Id. at p. 11). Consequently, by Order dated April 15, 2015, Plaintiff's objections were accepted as timely filed, and the Order and Memorandum dated March 31, 2015 were vacated. (Doc. 82). Defendants were allowed to respond to Plaintiff's objections, and did so by filing a memorandum of law on May 7, 2015. (Doc. 85).

This matter is now ripe for review. For the reasons set forth below, the R&R will be adopted in part and rejected in part.

## II.  STANDARD OF REVIEW

A district court may "designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition" of certain matters pending before the court. 28 U.S.C. § 636(b)(1)(B). The district court may accept, reject, or modify, in whole or in part, the findings and recommendations contained in the report. 28 U.S.C. § 636(b)(1)(C); M.D. Pa. L.R. 72.3. "If a party timely and properly files a written objection to a Magistrate Judge's Report and

Recommendation, the District Court 'shall make a de novo determination of those

portions of the report or specified proposed findings or recommendations to which

objection is made.'" LeGrand v. PPL Susquehanna, LLC, 2015 U.S. Dist. LEXIS

57596, at *2 (M.D. Pa. May 1, 2015) (Mariani, J.) (quoting 28 U.S.C. § 636(b)(1))

(citing Brown v. Asture, 649 F.3d 193, 195 (3d Cir. 2011); M.D. Pa. L.R. 72.3).

The de novo standard set forth in section 636(b)(1)(B) and Federal Rule of Civil

Procedure 72(b) is:

> "not intended to require the judge to actually conduct a new
> hearing on contested issues. Normally, the judge, on
> application, will consider the record which has been developed
> before the magistrate and make his own determination on the
> basis of that record, without being bound to adopt the findings
> and conclusions of the magistrate. In some instances, however,
> it may be necessary for the judge to modify or reject the
> findings of the magistrate, to take additional evidence, recall
> witnesses, or recommit the matter to the magistrate for further
> proceedings."

United States v. Raddatz, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94-

1609, p. 3 (1976)).

Before the Court is the Magistrate Judge's recommendation that

Defendants' motion for partial summary judgment be granted. (Doc. 71).

Granting summary judgment is proper if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show

6

that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); see Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original). "A disputed fact is 'material' if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law." Robins v. True, 2015 U.S. Dist. LEXIS 33433, at *4 (M.D. Pa. Mar. 13, 2015) (Kosik, J.) (citing Anderson, 477 U.S. at 247-48; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992)). "An issue of material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Robins, 2015 U.S. Dist. LEXIS 33433, at *4 (citing Anderson, 477 U.S. at 257; Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of Am., 927 F.2d 1283, 1287-88 (3d Cir. 1991)).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once such a showing has been made, the nonmoving party

must go beyond the pleadings with affidavits or declarations, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. FED. R. CIV. P. 56; Celotex, 477 U.S. at 324; Matsushida Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986). The party opposing the motion must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323. "The nonmoving party 'cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial.'" Robins, 2015 U.S. Dist. LEXIS 33433, at *5 (quoting Jones v. United Parcel Serv., 214 F.3d 402, 407 (3d Cir. 2000)). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1368 (3d Cir. 1992)).

## III.  DISCUSSION

### A.  Personal Involvement and Knowledge

Defendants argue that all claims against Defendants Hudson, Snider, Contri,

Gemberling, Sampson, and Webb should be dismissed from this action for lack of personal involvement in the alleged violations of Plaintiff's federal constitutional and statutory rights. (Doc. 65, pp. 6-13). Plaintiff's claims of Defendants' personal involvement are based on his allegations that the above mentioned Defendants were responsible for the cell assignment, and obtained personal knowledge of a substantial risk of harm as a result of the alleged warnings given by Plaintiff that the assigned cellmate was affiliated with a rival gang. (Doc. 55, pp. 16-19, 21, 25); (Doc. 69, pp. 9-11, 18, 20, 22, 24, 46-50); (Doc. 71, p. 5). Plaintiff also claims that the above-named Defendants knew or should have known that the cellmate had a documented history of violence against other inmates, and that Plaintiff was at risk of attack due to his cooperation with the government. (Id.).

Magistrate Judge Mehalchick found that the "record reveals that these Defendants were not aware of any potential risk of harm that could result by introducing the assailant to the cell, and were not responsible for decisions relating to cell assignments." (Doc. 71, p. 6). Specifically, Magistrate Judge Mehalchick stated in the R&R that:

> affidavits and log sheets submitted by each of the Defendants, together with position descriptions, confirm that Defendants Hudson, Snider, Contri, Webb and Gemberling were not

> witnesses to the assault on October 5, 2010, did not receive
> advance notice with respect to the risk of harm posed by the
> cell assignment, and were not responsible for decisions relating
> to cell assignments.

(Doc. 71, p. 6). In regards to Defendant Sampson, Magistrate Judge Mehalchick

found that:

> while Defendant Sampson responded to the attack on October
> 5, 2010, he was not involved with introducing the assailant to
> [Plaintiff's] cell, he was not informed of any potential for harm
> that could result from the cell assignment, nor was he, as a
> prison official, responsible for cell assignments.

(Id.) (citing Doc. 64). Magistrate Judge Mehalchick also noted that Plaintiff does

not refute these arguments or "otherwise provide evidence showing that these

Defendants had personal knowledge that force would be used or that these

Defendants were directly involved in its use." (Id.) (citing FED. R. CIV. P. 56(e)).

As a result, Magistrate Judge Mehalchick found that "these Defendants lack the

degree of personal involvement required for liability under Bivens." (Id.).

Magistrate Judge Mehalchick concluded that since  Plaintiff:

> cannot sustain his burden of producing evidence supporting an
> allegation of personal involvement on the part of Defendants
> with respect to the actions which he contends violated his
> rights, this Court recommends dismissal as to the claims
> against Defendants Hudson, Snider, Contri, Gemberling,
> Sampson and Webb.

(Id.).

Plaintiff objects to Magistrate Judge Mehalchick's recommendation that Defendants Hudson, Snider, Contri, Gemberling, Sampson, and Webb be dismissed from the above-captioned action. (Doc. 79, pp. 2-6). Plaintiff's main argument is that, contrary to the finding in Magistrate Judge Mehalchick's R&R, he has submitted sufficient documentation of each Defendant's personal involvement in the claims. (Id.). Specifically, Plaintiff alleges that he "has very well established proof that all defendants were personally involved in the alleged constitutional violations, as well as refuting any and all arguments made by all defendants . . . ." (Id. at p. 5). According to Plaintiff, he has submitted "any and all documentary evidence opposing any and all arguments of the defendants arguments in respect to the Plaintiff['s] claims of all defendants named in this action personal involvement in this action." (Id.).

Plaintiff also questions the relevance of the prison log sheet relied upon by Defendants. (Id. at p. 5 n.1). According to Plaintiff, the log sheet is:

> irrelevant, as it does not state where such defendants were at, at the relevant time of the attack on Plaintiff nor does it show who was present during the time of the attack, as the log in sheet is only made to show which head department's has entered [and] exited the unit of any given day.

(Id.). Further, Plaintiff claims that the "log in sheet of a unit is not used during a call of staff assistance during an emergency or conflict that may result to bodily

harm such as to this matter" presently at issue. (Doc. 79, p. 5 n.1).

Defendants respond to this objection by asserting that Plaintiff has failed to establish each Defendant's personal knowledge and involvement in his alleged constitutional violations. (Doc. 85, p. 3). Defendants argue that Plaintiff "continues to rely on conclusory terms that 'your defendants were all aware of my needs to be separated from all inmates whom pose a threat to my safety as to-and way before the date of October 5, 2010, when I was assaulted.'" (Id.). Defendants claim that Plaintiff "does not state how he had personal knowledge that any defendant knew that [his] safety was in jeopardy." (Id.). Further, Defendants argue that, pursuant to Federal Rule of Evidence 601, Plaintiff's declaration "does not overcome Defendants' evidence that they had no such knowledge of a risk to [Plaintiff's] safety." (Id.) (citing Doc. 64, pp. 6-8). "More importantly," Defendants contend, Plaintiff has not "refuted the record of affidavits, log sheets, position descriptions, which confirm that these Defendants were not aware of any potential risk of harm that could result from placing the assailant into [Plaintiff's] cell, and they were not responsible for cell assignments." (Id. at pp. 3-4). Consequently, Defendants conclude, "[Plaintiff's] claim thus fails." (Id. at p. 4).

After a de novo review, it is determined that Plaintiff has failed to establish Defendants Hudson, Snider, Gemberling, and Webb personal knowledge and

involvement.  These Defendants have submitted, inter alia, their respective sworn statements and position descriptions, and the Special Management Unit's sign-in log in support of their argument that each of the above-mentioned Defendants lack the requisite personal involvement and knowledge in the claims advanced by Plaintiff. (Doc. 64, pp. 13-103).  Defendants' evidence as to Defendants Hudson, Snider, Gemberling, and Webb has not been sufficiently rebutted by Plaintiff. Thus, as discussed in more detail below, Defendants Hudson, Snider, Gemberling, and Webb lack the personal knowledge and involvement required to be held liable for the claims advanced by Plaintiff.  (Id.).

In regards to Defendant Hudson, he submitted his sworn statement in support of Defendants' contention that his "job duties did not include housing assignments decisions," nor did they include "determining what inmates were classified as separates from other inmates." (Id. at p. 22).  Further, Defendant Hudson declares that he "never oversaw the unit team which is department that is generally responsible for making cell assignments." (Id. at p. 23).  Defendant Hudson also states that he "was never involved with cell assignments in [his] capacity as Associate Warden while assigned to USP Lewisburg." (Id.). Moreover, Defendant Hudson also declares that he was "not present on D-Block third floor on October 5, 2010, when the Plaintiff was assaulted." (Id.).  In

13

support of this declaration, Defendant Hudson submitted the "sign in log for D Block for the week of 10/3/10 through 10/9/10," which establishes that he did not sign in to D Block on October 5, 2010. (Doc. 64, pp. 23, 32-35). Additionally, Defendant Hudson states that he "never received oral or written information from the Plaintiff that he had concerns for his safety." (Id. at p. 23). Further, Defendant Hudson states that he "had no advance knowledge of the cell assignment between the Plaintiff and [the new cellamte] who ultimately assaulted" Plaintiff. (Id.). Defendant Hudson also states that he "had no knowledge that [the new cellmate] posed any risk of harm to the Plaintiff," nor did he have "knowledge that [Plaintiff] supposedly cooperated with the government." (Id.).

As to Defendant Snider, he submitted a sworn statement attesting that he "was not involved with the cell assignment of the Plaintiff and the assailant . . . ." (Id. at p. 37). Further, Defendant Snider also states that he "was not present when they were placed in the cell together on October 5, 2010," and "was not present when the assault broke out on October 5, 2010." (Id.). In support of his contention that he was not present on D-Block at any relevant time regarding the alleged assault, Defendant Snider submitted the "sign in log for D Block for the week of 10/3/10 through 10/9/10," which establishes that Defendant Snider "was not on Plaintiff's housing unit the day of the incident/assault (October 5, 2010)."

14

(Doc. 64, pp. 37, 49-51). Further, Defendant Snider also states that he is "unaware of the gang affiliation of either the Plaintiff or [the cellmate]," and "would not have been aware of their gang affiliation on October 5, 2010." (Id. at p. 37). Defendant Snider also declares that he "had no knowledge that [the cellmate] posed any risk of harm to the Plaintiff." (Id.).

In regards to Defendant Gemberling, he submitted a sworn statement attesting, inter alia, that he "was assigned to the 'D Unit, Number One' position on October 5, 2010." (Id. at p. 61); see (Id. at p. 70). Defendant Gemberling states that "[a] the Number One Officer of the Unit, [he] was assigned to the first floor of D Unit." (Id. at p. 61). According to Defendant Gemberling, "[a]s the first floor officer I would not have been involved in cell moves being made on the third floor," and "would not have been present on the third floor for a cell move with Harper and [the new cellmate]." (Id.). Defendant Gemberling also states in his sworn statement that:

> I was not aware (and currently am not aware) of any gang affiliations of either inmates Harper or [the cellmate]. I was not aware (and currently am not aware) of inmate Harper cooperating with the government. I had no advance knowledge of the cell assignment between the Plaintiff and [the cellmate] who ultimately assaulted him. I had no knowledge that [the cellmate] posed any risk of harm to the Plaintiff.

(Id.).

As to Defendant Webb, he submitted a sworn statement, which states, inter alia, that he was "Correctional Officer assigned to the 'D Unit, Number Four' position on October 5, 2010." (Doc. 64, p. 88); see (Id. at p. 97). "As the Number Four, [he] was in possession of the keys which worked the 'lock box' on each of the floors in the unit." (Id. at p. 88). According to Defendant Webb, "[s]ince [he] had the keys to the lock box, [he] did not go down range in proximity to the cells." (Id.). Consequently, Defendant Webb declares that he "did not assist with placing Harper and [the cellmate] in the cell together." (Id.). Although Defendant Webb does state that he does "not recall the incident on October 5, 2010," he "can state [that he] would not have been one of the officers escorting a cell mate to Plaintiff's cell, due to the fact that [he] had the keys to control the lock box on the ranges." (Id.). As a result of his positioning as the "Number Four," Defendant Webb states that he "would not have been in close proximity to the cell when [the cellmate] was brought to the cell and placed in with" Plaintiff. (Id.). Defendant Webb also states that:

> I was not aware (and currently am not aware) of any gang affiliations of either inmates Harper or [the cellmate]. I was not aware (and currently am not aware) of inmate Harper cooperating with the government. I was unaware that [the cellmate] posed any risk of harm to Harper.

(Id.).

16

In response, Plaintiff cites to, <u>inter alia</u>, his declaration in an attempt to rebut the evidence establishing that Defendants Hudson, Snider, Gemberling, and Webb lack knowledge and personal involvement in the alleged claims.  (Doc. 79, p. 5); <u>see</u> (Doc. 44, pp. 29-44); (Doc. 69, pp. 41-52).  However, Plaintiff's conclusory, self-serving declarations regarding Defendants Hudson, Snider, Gemberling, and Webb, which are contradicted by Defendants' documentary evidence, are "insufficient to withstand a motion for summary judgment." <u>Kirleis v. Dickie, McCamey & Chilcote, P.C.</u>, 560 F.3d 156, 161 (3d Cir. 2009); <u>Runkle v. Dep't of Labor & Indus., 2014 U.S. Dist. LEXIS 79124</u>, 2014 U.S. Dist. LEXIS 79124, at *19 (M.D. Pa. 2014) (Conner, J.); <u>see</u> FED. R. CIV. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); <u>see generally</u> <u>Nationwide Mut. Ins. Co. v. Roth</u>, 252 F. App'x 505, 508 (3d Cir. 2007) (Defendant could not rely on self-serving affidavit to overcome the overwhelming documentary record evidence and avoid summary judgment).  Consequently, Defendants' motion for partial summary judgement will be granted in part and thus, Defendants Hudson, Snider, Gemberling, and Webb will be dismissed for their lack of personal knowledge and involvement.

17

With respect to the claims against Defendant Sampson, a genuine issue of material fact remains. As to Plaintiff's allegation that Defendant Sampson failed to intervene in the alleged October 5, 2010, assault, Defendants have failed to satisfy their burden of showing the absence of a genuine issue as to any material fact. (Doc. 55, pp. 19-23); (Doc. 69, p. 12). Specifically, Defendant Sampson does not deny that he was present during the alleged assault. (Doc. 64, p. 78). According to Defendant Sampson's sworn statement, he responded to an assistance call for a cell fight on the third floor of "D-Unit." (Id.). Defendant Sampson states that "[w]hen [he] arrived, [the cellmate] was assaulting [Plaintiff] who was in hand restraints." (Id.). He claims that he "ordered [the cellmate] to submit to hand restraints but he refused." (Id.). Defendant Sampson "again ordered [the cellmate] to submit to restraints and he complied." (Id.).

However, the question here is not whether Defendant Sampson eventually intervened in the alleged assault. Rather, the question is whether Defendant Sampson intervened when he had a reasonable opportunity to intervene in the alleged assault. Even if it is assumed that Defendant Sampson is declaring that he immediately ordered the alleged assault to cease upon his arrival at the scene, Plaintiff has submitted his own declaration disputing that account. Plaintiff claims that Defendant Sampson, among others, were at the door of his cell during the

18

alleged assault. (Doc. 69, p. 12). According to Plaintiff, Defendant Sampson and other individuals watched the cellmate carry out the alleged assault, which Plaintiff claims lasted thirty-five (35) to forty-five (45) minutes. (Id. at pp. 12, 49). Thus, viewing the disputed facts and taking all inferences in Plaintiff's favor, Defendants have failed to satisfy their burden that there is an absence of a genuine issue of material fact regarding whether Defendant Sampson intervened in the alleged assault when he had a reasonable opportunity to take such action. See Smith v. Mensinger, 293 F.3d 641, 650 (3d Cir. 2002) ("[A] corrections officer's failure to intervene in a beating can be the basis of liability for an Eighth Amendment violation under § 1983 if the corrections officer had a reasonable opportunity to intervene and simply refused to do so."). As a result, Defendants' motion for summary judgment regarding Plaintiff's claim that Defendant Sampson failed to intervene will be denied.

As to the other claims against Defendant Sampson, his sworn declaration states that he was "D Unit, Rover" position on October 5, 2010," "not present when the inmates were placed in the cell together," and "[n]either inmate expressed any concerns to me." (Doc. 64, p. 78). Defendant Sampson also declares under the penalty of perjury that:

> I was not aware (and currently am not aware) of any gang

> affiliations of either inmates Harper or [the cellmate].  I was
> not aware (and currently am not aware) of inmate Harper
> cooperating with the government.  I was not aware that [the
> cellmate] posed any risk of harm to the Plaintiff.

(Doc. 64, p. 78).  Importantly, Defendant Sampson does not state that his assigned

position of "D Unit, Rover" on October 5, 2010, indicates that he could not have

been present for the cellmate transfer at issue.  See (Id. at pp. 77-79).

Plaintiff rebuts the contention that Defendant Sampson lacks personal

knowledge and involvement through his own sworn statement.  Contrary to

Defendant Sampson's declaration, Plaintiff states that on October 5, 2010,

Defendant Sampson was present at his cell prior to the introduction of the alleged

assailant into his cell.  (Doc. 69, pp. 45, 47).  Further, Plaintiff states that

Defendant Sampson was present at his cell door when Plaintiff heard other

inmates telling the alleged assailant "to cause [Plaintiff] harm" when he was

placed in Plaintiff's cell.  (Id. at pp. 46-47).  Plaintiff also alleges that he

"continued to tell the awaiting staff, that just heard all the inmates on the D-Block

3rd Floor, that was connected with the inmate who pose danger to [Plaintiff], that

[he could] not cell with no gangs or groups that is likely to assault [him], as [he is]

cooperating with the government on my case . . . ."  (Id. at p. 47).  Plaintiff states

that he also told the awaiting staff, which allegedly included Defendant Sampson,

that "you all just heard them guys tell the inmate your bringing to my cell to assault me if he" is placed in Plaintiff's cell. (Doc. 69, p. 47).

In light of the contradictory evidence as to Defendant Sampson's personal knowledge and involvement, there are genuine issues of material fact precluding the entry of summary judgment as to the claims against Defendant Sampson. Consequently, Plaintiff's objection to Magistrate Mehalchick's recommendation that summary judgment be granted in favor of Defendant Sampson will be sustained.

Defendants also argue that Defendant Contri should be dismissed because he was not present on D-Block from 10:30 a.m. and 11:30 a.m., which is when Plaintiff alleges the assault occurred, and had no advance knowledge that Plaintiff was receiving a new cellmate on October 5, 2010, or any indication that the proposed new cellmate posed a risk of harm to Plaintiff. (Doc. 65, p. 7). In support of this claim, Defendants cite to the D-Block sign-in log from October 3, 2010, to October 9, 2010. (Doc. 64, p. 53); (Doc. 65, p. 7). The D-Block sign-in log establishes that Contri signed into D-Block on October 5, 2010, at 8:04 a.m. (Doc. 64, pp. 53, 58); (Doc. 65, p. 7). However, the sign-in log does not establish when Contri signed out of D-Block. (Doc. 64, p. 58). Rather, Defendants' argument that Defendant Contri lacks the requisite personal involvement and

knowledge rests, in part, on his sworn statement that he usually spends thirty (30) minutes on the unit. (Doc. 64, p. 53). Thus, Defendants argue, this evidence establishes that Defendant Contri was not on D-Block around 11:00 a.m., the time of the alleged assault. (Id.); (Doc. 65, p. 7). Defendants also cite to Plaintiff's Psychology Data System note from October 5, 2010. Defendants argue that the lack of any indication in that note regarding the impending cell assignment establishes that Contri lacked awareness of any threats posed to Plaintiff. (Doc. 64, pp. 53, 55); (Doc. 65, p. 7). Specifically, Defendant Contri asserts in his declaration that "[h]ad [Plaintiff] expressed concerns I would have made an entry to that extent in my note." (Doc. 64, p. 53).

Plaintiff alleges that on October 5, 2010, he informed Defendant Contri about the risk the proposed new cellmate posed to Plaintiff. (Doc. 69, pp. 45-46). According to Plaintiff, Defendant Contri allegedly instructed Plaintiff to "put everything . . . on paper" and told him that he would take Plaintiff's note to "the people who deal with" cell assignments. (Id. at p. 46). Plaintiff alleges that he wrote down his concerns about his new cellmate and "gave [his] letter to Dr. Contri." (Id.).

In light of the contradictory affidavits as to Defendant Contri's personal involvement in the claims advanced by Plaintiff, genuine issues of material fact

22

precluding the entry of summary judgment as to Defendant Contri. Consequently,

Plaintiff's objection to Magistrate Mehalchick's recommendation that summary

judgment be granted in favor of Defendant Contri will be sustained.

## B.    Demand for Compensatory Damages

Defendants' motion for partial summary judgment also seeks to limit

Plaintiff's claim for compensatory damages to the amount stated in his

administrative tort claim. (Doc. 65, p. 14). On July 11, 2011, Plaintiff filed an

administrative tort claim which sought ten thousand dollars ($10,000.00) in

compensatory damages. (Doc. 64, p. 17). As noted in the R&R, Plaintiff's

amended complaint does not specify the amount of damages he is seeking for his

FTCA claim. (Doc. 55, p. 23); (Doc. 71, p. 7). Instead, Plaintiff's prayer for relief

regarding his FTCA claim states:

> [t]hat judgment be entered for Plaintiff and against Defendants
> for compensatory and punitive damages, together with the costs
> of litigation, including reasonable attorney's fees and costs, and
> any other equitable or legal relief that the case may require and
> that the court deem just and proper.

(Doc. 55, p. 23).

Magistrate Judge Mehalchick found that Plaintiff cannot recover more than

what he sought in his administrative tort claim unless he presents newly

discovered evidence, or alleges and proves intervening facts, relating to the

23

amount of the claim.  (Doc. 71, pp. 6-7) (citing 28 U.S.C. § 2675(b)).  Plaintiff

argues that he recently discovered that the injuries he sustained from the alleged

assault, which form the basis of this action, have become worse and will not

improve with surgery.  (Doc. 69, p. 31).  However, Magistrate Judge Mehalchick

found that Plaintiff failed to "proffer evidence supporting this claim." (Doc. 71, p.

7).  As a result, Magistrate Judge Mehalchick recommends that Plaintiff's FTCA

claim for compensatory damages be limited to ten thousand dollars ($10,000.00).

(Doc. 71, p. 7) (citing Schwartz v. United States, 446 F.2d 1380 (3d Cir. 1971)).

Plaintiff filed an objection to this portion of Magistrate Judge Mehalchick's

R&R and argues that it should not be adopted because newly discovered evidence

shows that his alleged injuries have become "worse." (Doc. 79, pp. 7, 9).  Plaintiff

points to the "impairment evaluation report of Dr. Brian C. Jeondeph and Dr.

Charlene J. Hickson" in support of this objection.  (Id.).  According to Plaintiff,

these reports establish that the "injuries [he] suffered will remain permanent,

without only more possible complications," and that "these injuries of Plaintiff['s]

conditions was not reasonably discoverable by him at the time he filed his Form

95 tort claim on July 11, 2011 . . . ." (Id. at pp. 7-8).  Plaintiff also claims that the

record shows that he "continually updated the medical department of (BOP) of his

medical conditions during the pendency of his tort claim with it." (Id. at p. 8).

24

Plaintiff also argues that at the time he filed his administrative tort claim he "could not have predicted the permanency of his injuries . . . nor when he file[d] this civil action . . . ." (Doc. 79, p. 8). According to Plaintiff, he has submitted documentation of the worsening of his alleged injuries at an "early stage of this action," as well as discussing the status of his alleged injuries in his amended complaint, his opposition brief to the motion for summary judgment at issue, and his declaration submitted in support of his brief in opposition. (Id.).

Defendants argue that Plaintiff's claim that he has lost his sight and hearing is not supported by the record. (Doc. 85, p. 4). Defendants also contend that Plaintiff has failed to present any evidence that his alleged injuries "were misevaluated or miscalculated." (Id.) (citing Doc. 79, pp. 12-29). As a result, Defendants conclude, Plaintiff has failed to show "new discovered evidence or intervening facts" as required under 28 U.S.C. § 2675(b). (Id.). Defendants continue by asserting that Plaintiff is currently being treated by the BOP, and that Plaintiff has not established that "there has been some change in treatment or an acknowledgment of some misdiagnosis." (Id.) (citing Doc. 79, pp. 12-29). Further, Defendants also point out that Plaintiff "has no expert testimony to demonstrate that any of his alleged injuries are result from the incident at issue in this case." (Id.).

25

In regards to the alleged injuries he has suffered to his vision, Plaintiff objects to the R&R's conclusion to limit his FTCA claim to ten thousand dollars ($10,000.00) by arguing that the report authored by Dr. Jeondeph is sufficient proof that section 2675(b) has been satisfied and thus, he should be entitled to seek damages beyond those sought in his administrative tort claim. (Doc. 79, pp. 12-14). After a de novo review of the record, Plaintiff's argument that his alleged injuries to his vision have become worse fails to satisfy section 2675(b).

As to Plaintiff's right eye, on May 15, 2012, Plaintiff reported to health services at USP-Lewisburg and complained that he was "losing vision in [his] left eye after being assaulted during incarceration in 2010 with slight decreased vision in right eye." (Doc. 44, p. 79). The examiner found Plaintiff's "[o]ne eye" to have "severe impair," while he was found to have "normal vision" in the "other eye." (Id. at p. 80). Specifically, Plaintiff underwent a visual acuity exam, which found the vision in his right eye to be "20/70," whereas the vision in his left eye was "20/400." (Id.).

On October 5, 2012, Plaintiff underwent an vision exam with Dr. Jeondeph at the Colorado Retina Associates. (Doc. 79, pp. 12-14). While Plaintiff argues that this exam establishes that the alleged injury to his vision has become worse, the results from the exam performed by Dr. Jeondeph actually establish that the

vision in his right eye has improved since it was evaluated by health services at USP-Lewisburg on May 15, 2012. (Doc. 79, pp. 12-14). During his visit with Dr. Jeondeph, Plaintiff underwent two (2) visual acuity exams. (Id.). One exam found Plaintiff's vision in his right eye to be "20/60," while the other exam found the vision in his right eye to be "20/40." (Id. at p. 12). Comparing these results with those from May 2012, and contrary to Plaintiff's contention, Plaintiff's vision in his right eye appears to have improved slightly. (Doc. 44, p. 80); (Doc. 79, p. 12).

Plaintiff also fails to establish that the injury to his vision in his left eye has become worse since the filing of his administrative tort claim. Specifically, on February 15, 2011, Plaintiff stated that he "can't see out [of his] left eye . . . ." (Doc. 44, p. 98). On March 11, 2011, Plaintiff stated that his "vision is basically limited to dark/light in (L) eye." (Doc. 79, p. 24). On March 21, 2011, Plaintiff stated that he has not been "able to see out of [his] left eye," since the alleged assault. (Doc. 44, p. 83). On June 14, 2011, Plaintiff asserts in his administrative claim that he "lost left eye vision." (Id. at p. 218). On August 23, 2011, Plaintiff stated that the vision in his left eye "is blurry and [he] can't see clear out of it." (Id. at p. 74). Further, during his March 15, 2012, clinical encounter, his vision in his left eye was found to be "20/400" during an unaided visual acuity exam. (Id. at p. 80). On May 15, 2012, Plaintiff reported "losing vision in left eye after being

assaulted during incarceration in 2010 with slight decreased vision in left eye."

(Doc. 44, p. 79).  As noted above, during the exam on May 15, 2012, his vision in

his left eye was found to be "20/400."  (Id. at p. 80).  On October 5, 2012, Plaintiff

stated that the day after the alleged assault his "vision went completely blurry" in

his left eye. (Doc. 79, p. 12).  During his exam with Dr. Jeondeph, Plaintiff's

vision in his left eye was found to be "CF3," or being able to count fingers at three

(3) feet, during a dynamic visual acuity exam. (Id.).

    Thus, as a result of the foregoing, Plaintiff's reliance upon his exam with

Dr. Jeondeph to satisfy section 2765(b) fails because Dr. Jeondeph's report does

not constitute newly discovered evidence establishing that the alleged injuries to

Plaintiff's vision have become worse since the filing of his administrative tort

claim.

    To the extent that Plaintiff attempts to rely upon the January 20, 2012, exam

note authored by Dr. Charlene J. Hickson from Pueblo Ear, Nose & Throat

Specialist to establish that the alleged injuries to his hearing have become worse

since the filing of his administrative tort claim on July 11, 2011, his claim fails.

(Id. at pp. 9, 15).  Dr. Hickson's note states that when Plaintiff was assaulted in

2010 he "noted the hearing loss after this time." (Id.).  After reviewing two prior

audiograms, Dr. Hickson found that Plaintiff had "asymmetric hearing loss with

profound loss in the left and severe loss on the right." (Doc. 79, p. 15).

Plaintiff's reliance on Dr. Hickson's note to satisfy 28 U.S.C. § 2675(b) in order to seek damages above the request in his administrative tort claim is misguided because it fails to establish that Plaintiff's condition has gotten worse since the filing of his administrative tort claim. Specifically, on June 6, 2011, approximately one (1) month prior to the filing of his administrative tort claim, Plaintiff had a clinical encounter with health services at USP-Lewisburg because he had a poor result on a hearing test and was advised to obtain further consultation. (Id. at p. 18). During his clinical encounter on June 6, 2011, Plaintiff was given a hearing test. (Id.). The test found that he was deaf in his left ear and, after a "[s]emi-manual test on his right ear was done and it wasn't much better." (Id.). The findings discussed in the administrative note dated June 6, 2011, are consistent with the findings of Dr. Hickson on January 20, 2012. (Id. at pp. 9, 15, 18). Furthermore, Dr. Hickson's note does not state that Plaintiff's hearing loss has changed since the filing of his administrative tort claim on July 11, 2011. (Id. at p. 18). Consequently, it is determined that Plaintiff has failed to satisfy section 2675(b) because he has not presented new evidence establishing that the injuries to his hearing have become worse since the filing of his administrative tort claim. (Id. at p. 15).

As a result of the foregoing, Plaintiff's argument that the reports of Dr.

Brian C. Jeondeph and Dr. Charlene J. Hickson are "newly discovered evidence . .

. or intervening facts" sufficient to satisfy section 2675(b) is unavailing because

these reports do not establish that Plaintiff's injuries have become worse since the

filing of his administrative tort claim on July 11, 2011. Therefore, Plaintiff's

objection will be overruled and Magistrate Mehalchick's recommendation to grant

this portion of Defendants' motion for partial summary judgment will be adopted.

Consequently, Plaintiff's FTCA claim will be limited to ten thousand dollars

($10,000.00).

### C.   **Punitive Damages**

Defendants move to preclude Plaintiff from recovering punitive damages

from his FTCA claim against the United States of America. (Doc. 65, pp. 14-15).

Plaintiff responds in his brief in opposition by arguing that he is not seeking

punitive damages from the United States of America under his FTCA claim. (Doc.

69, pp. 33-34). Magistrate Judge Mehalchick found that, pursuant to 28 U.S.C. §

2674, Plaintiff "cannot recover punitive damages against the United States in his

FTCA action." (Doc. 71, p. 8). Thus, Magistrate Judge Mehalchick recommends

that, to the extent that Plaintiff seeks punitive damages against the United States,

Defendants' motion for partial "summary judgment with respect to Plaintiff's

request for punitive damages in his amended complaint" should be granted. (Doc. 71, p. 8).

Although Plaintiff filed an objection as to this portion of Magistrate Mehalchick's R&R, it appears that he does not dispute the R&R's conclusion. (Doc. 79, pp. 9-10). Rather, Plaintiff utilizes this section of his objections to the R&R as a means to clarify his position as to whether he is seeking punitive damages. (Id.). Specifically, Plaintiff argues that he is seeking punitive damages under 42 U.S.C. § 1983 "against individuals sued in their individual capacity . . . ." (Id. at p. 9). Thus, it appears that Plaintiff concedes that he cannot recover punitive damages through an FTCA claim against the United States of America. As a result, Plaintiff will be precluded from seeking punitive damages through an FTCA claim against the United States of America. Consequently, Plaintiff's objection to Magistrate Mehalchick's recommendation that his claim for punitive damages against the United States be precluded will be overruled. Magistrate Judge Mehalchick's R&R granting this portion of Defendant' motion for partial summary judgment seeking to preclude any punitive damages under Plaintiff's FTCA claim against Defendant United States of America in this matter will be adopted.

## IV.   <u>CONCLUSION</u>

As a result of the foregoing, this Court will adopt the R&R dated January 7, 2015, in part and reject it in part.  (Doc. 71).  Specifically, the R&R will be adopted as to the portions recommending that summary judgment be granted in favor of Defendants Hudson, Snider, Gemberling, and Webb; Plaintiff's FTCA claim for compensatory damages be limited to ten thousand dollars ($10,000.00); and Plaintiff's punitive damages claim under the FTCA against the United States of America be dismissed.  The portion of the R&R recommending that summary judgment be granted in favor of Defendant Sampson and Defendant Contri will not be adopted.

A separate Order will be issued.


Date: August 14, 2015                          /s/ William J. Nealon
                                               **United States District Judge**